Thank you, Your Honor. May it please the court. My name is Chris Holland. I represent Silicon Knights, the plaintiff and the underlying action and the appellant here before the court. As we have set forth in our papers, this case really involves a disparate application of the rules across a number of different fronts throughout the lower court trial. Specifically, each and every attempt by plaintiff to prove its case was met with very exacting scrutiny and any perceived real or imagined flaws in the case were found to be fatal. Conversely, at every turn, any problems with Epic's counterclaims were overlooked, ignored, or ultimately ruled not to be problematic as they were with our case. I think a couple of the briefings highlight that. Silicon Knights was not allowed to introduce evidence of the voluminous third-party complaints regarding the Unreal 3 engine. That included even complaints that were put on a blog listing that all third-party licensees had access to and on which Epic acknowledged those complaints, responded to them, and in many cases admitted that there were not permitted to put those forth simply because they were alleged to have been made after the 2005 signing of the contract, despite the fact that the contract encompassed a number of games and therefore required that Silicon Knights continue to, if the court will, re-up with its agreement with Epic at each and every turn. On the converse, Epic was permitted to put in whatever third-party praise it wanted about the engine at any point in time, including praise well after the signing of the contract, including third-party praise that if the rationale regarding hearsay and regarding 403 rulings were to be applied evenly, those issues should have been excluded as well. Certainly, at a minimum, we should have been allowed to introduce the third-party complaints to challenge the position their witnesses took on the stand that there were no problems with the engine, that, in other words, the way they were able to cast, as we phrased in the briefing, Silicon Knights as this lone complainant in the wilderness among the 178 licensees, which was really what the jury was ultimately presented with. The second piece of rulings that I think are emblematic of what we're discussing here are the exclusion of all evidence of Epic's own fraudulent conduct after the signing of the contract. And it appears, as we've briefed and as we've discussed in the reply, that the court perceived all possible fraud to have ceased as of the date of the signing of the contract, rather than viewing it as an independent and alternative grounds for relief. And again, where the contract specifically contemplated a series of engine usages that Silicon Knights would engage in, certainly the ongoing misrepresentations that occurred throughout the period of usage would be relevant. And again, if we look at the opposite side, Epic was allowed to introduce all of that Silicon Knights' ongoing usage, was allowed to make comment on what Silicon Knights was supposedly doing with the code, whether it was gutting the engine fast enough or not, and make all the arguments it made, all of which post-dated the signing of the contract. And yet we were not able to put those even in context on cross-examination by showing that some of the actions, some of the continued usage that Silicon Knights was making was a direct result of the ongoing misrepresentations by Epic. And again, I think those two examples really amplify what we're talking about here. The third that I would point out would be the exclusion of what came to be referred to as the blacklist. Subsequent to filing of the complaint, Silicon Knights was put on a list for every single one of the several dozen licensees, including several major publishers, that if that publisher, when it signed up as a licensee with Epic, would do business with Silicon Knights, it would never be able to do business with Epic. That is very dramatic evidence, I would submit, of the UDPTA, the Unfair and Deceptive Trade Practices Act claim that we had. The grounds on which that was excluded was that it came after, again, the signing of the complaint. But again, under simple notice pleading in federal court, I'm alleging the same tort. The fact that I discover additional evidence of that tort throughout the discovery process should not be something that is fatal to me pursuing that tort or utilizing the evidence that I've discovered through the discovery process. And yet, when we attempted to introduce that case law to support a claim for fraud in Futuro? Yes, there is, Your Honor, and I believe we've cited that in the briefing, the concept that fraud is something that is an ongoing tort and can be, because there's two distinct claims, fraud in the inducement, you defrauded me in signing up for the contract, and then especially in a situation like this, when you're saying, my engine in an ongoing fashion, I certainly believe that's the perfect example. And again, I apologize, I don't have the case citation for you. Certainly, there's nothing from this circuit that we'd be binding on you. But the precedent is certainly there for fraud as an ongoing tort, and that's why fraud as an ongoing tort exists separate and independent as an alternative grounds that we've pled. I would also submit that, again, even if the court were to from my prima facie case of that ongoing fraud and the ongoing third-party complaints after the signing of the contract, I still should have been allowed to, I still should have been able to use those in cross-examination when their witnesses get up and take the stand and deny knowledge, claim that the engine works, claim that none of these problems that Siliconites has proffered even existed. And I think certainly when we look at the exclusion of, or the granting of the Rule 50 motion that effectively threw out all of the fraud-based tort claims, there's a relevance there as well. When the standard is, is there any sufficient legal basis for any reasonable juror to believe the evidence supports my client's claims, and taking all of that in the light most favorable to Siliconites? With that as a standard, certainly looking at complaints contemporaneously by Disney, through its Buena Vista Games Division, by Electronic Arts, by Ubisoft, by Midway, by all of the major publishers around the world of video games, they're all complaining. Disney's complaint, the reason we highlighted it in the that Siliconites had, and it was sent to Epic literally contemporaneously with filing of this lawsuit. Disney complained, and the Epic paid them their money back. If that is not at least evidence, even if I'm not allowed to use it in my case in chief, even if the court agrees on that, it certainly is informative for the court on a de novo review of whether or not reasonable people could view Siliconites claims as having merit, since multitudes of other publishers in this industry who had this exact same set of problems, lodged those same complaints with Epic, and in many cases, depending on, basically what it came down to was, the bigger you are, the more attention you get from Epic. A small company like my client is not allowed to even be cared about in its and ultimately, as we go through the trial, all of those other complaints are excluded, and we're left, as I said, appearing to be, to the jury, a lone wolf sort of crying in the wilderness for relief, which was not factually the case. And I think certainly on the denial of the Rule 50 motion, I think in terms of reasonableness, could reasonable people agree with us, that's informative. On the other side, looking at the counterclaims and what was allowed to occur in terms of judgment against my client, certainly the same standards were not put forth. Lack of a deposit of the code in front of the copyright office was simply overlooked. De minimis, absolutely de minimis copying admitted by their experts, by their own witnesses, simply overlooked, even though, and to the court's point, there's not a single case anywhere in any jurisdiction, district court or appellate level, that finds 0.5% to 2% copying sufficient to find copyright infringement. They can't cite one. It doesn't exist. Yet the court allowed that to proceed, whereas that was, in my view, if I'm getting held these other standards and all my cases getting thrown out, I couldn't imagine that that's not going to go forward on the other side, or the same standards not going to apply. Similarly, with respect to the trade secrets, their founder admitted repeatedly that all of those major companies that I just mentioned, Electronic Arts, Ubisoft, all of them had access to these same supposed trade secrets. They were under licensing agreements. They were, Your Honor. That's how they got access to the code. Why is that probative of your issue of trade secrets? Because it's probative because when you give, you're absolutely right, the bare license is all they have. They say, well, I signed up a license agreement with them. Therefore, to rephrase what they're saying, whatever they do with the code, I guess, is okay. That's not the standard. When you know that you're licensing up, not simply third parties, not simply unknown people that are smaller developers like my client, but large major competitors like Ubisoft, Microsoft, Electronic Arts, Midway, all these huge companies that have reams and reams of developers working, and you give them your code, and you know they are making not only games with your code, but directly competitive games that are based on big game engines being made simultaneously by the same developing parties. And in fact, again, if we go back to the third party complaints, in those complaints, it's reflected that many of those people are saying, well, your stuff doesn't work. So I'm going to put my team from my own game over here on this code to make sure it works, to get it fixed and go forward. That is the evidence that we're talking about, that they are on notice then, your honor, that they have to simply not say, well, I got a license agreement with them, so I'm just going to assume that they aren't going to breach it. They have to take action to be reasonable. That's, again, the standard. What reasonable steps do they take to ensure that they kept their secret out of the hands of people that weren't allowed to have it? And the way their contracts are structured, it's only supposed to be the people working on their games that are supposed to look at. They're not supposed to just be able to cross pollinate between all of their other game developers, especially when they're putting out an engine, as was the case with all of those that I listed. They all had engines that were being put out in competition with the UE3 game engine, the engines that were the basis of their other games. And as a result, they were on notice, your honor, if you will, to take more reasonable steps and not simply say, I'm going to willfully turn a blind eye and ignore what is right in front of me. Certainly, the cases, again, that we've cited in the brief bear that out, that when you're given notice like that, you need to take those reasonable steps. The same thing is true with respect to the double recovery issue. And again, in the briefs, Epic pointed out that one of their thought, for example, with respect to the code deposit, if the proper code wasn't deposited and there was no proof of that given to the jury, well, there's no harm. Well, there is harm. First of all, the jury is then left with a false impression that not only is something that Epic supposedly created, but also that somehow the federal government, via the Copyright Office, has blessed it as being something very important and registrable when, in fact, the evidence was never put forth to show what, in fact, was ever registered. And that was very important in this type of situation where you've got multiple iterations, 27 or 28 iterations of the game engine that supposedly were given to my client. And at no point are they ever saying, well, this is the one, this is the part of this one that was actually registered. You're talking about double recovery now, right? I am. Sorry, I apologize. I actually switched over. I'm talking about the attorney's fees claim because when they got the . . . Did you talk about double recovery? You said something about it. I did, and I apologize, Your Honor. I switched over the copyright on that because the reason the copyright issue was important was because they were allowed to then bootstrap that up and claim attorney's fees. And I did slip up. With respect to double recovery, their entire position is that somehow there was additional harm that was being compensated by the copyright infringement or by the trade secret infringement. And separate it apart, even if the court allows those claims to go forward, which I do not think they should, separate it apart from that, they should not be able to then be made whole by virtue of a $2.7 million recovery for the license fees. Because once the license fees are paid, de facto, no other use was improper. Again, the third party uses it. Evidently, you can do whatever you want with the code once you've paid the license fee. And their only argument is, well, somehow there was this additional benefit that was given to Silicon Knights. The only reason they were able to present that as a benefit was because their expert on damages literally discounted every dollar of revenue Silicon Knights ever got and said that all was beneficial to SK. And our damages expert wasn't even allowed to rebut that and take into account costs, insurance facilities, and other things that one typically would to determine whether there was indeed a profit, which there was not in this case. I'm short of time here. I don't know if the court has any further questions. If not, I'll wait for rebuttal. Yes. Thank you, Your Honor. I'm probably not going to get this right. Mr. Schabelsky? I got it exactly right, Your Honor. All right. We're glad to hear from you. Thank you. If it pleases the court, I'm Mike Schabelsky here on behalf of Epic Games. I think it's important that the court not lose sight of the big picture here. Silicon Knights had the benefit of a five-year discovery period to marshal whatever evidence it could in support of its claims. We then had a nearly three-week jury trial. The jury heard their evidence and came back against them across the board. The jury rejected Silicon Knights' breach of contract claim, finding that Epic did nothing wrong under the contract. We delivered an engine that worked as promised. And it found instead that it was Silicon Knights that had breached the license agreement, that it had used our code in an unauthorized manner to work on several video game projects without paying a license fee. And in addition, in doing so, they massively stole our trade secrets. Some 333 trade secrets were proven that they had stolen, and they massively infringed the copyright. And they did so in order to earn tens of millions of dollars. Now, all the arguments they have raised on appeal do not challenge those fundamental facts that the jury found that Epic did not breach the contract, but it was Silicon Knights that did, and it was Silicon Knights that stole from us. Now, the plethora of little arguments that we've heard today don't change any of that. Turning first to the third-party complaint issue. First, the court does not need to consider this issue at all if it affirms the dismissal of the fraud counts. That is because below, the only proffered relevance for this evidence related to the fraud claims only. It was not proffered to have any relevance on Silicon Knights' breach of contract claim or our counterclaims. Secondly, the court must make clear the very limited nature of the allowed evidence of complaints that predated the party's license agreement. What the court excluded, and the only thing it excluded, was hearsay evidence of post-license agreement complaints. The reason the court drew that distinction was because all the complaints were hearsay, something counsel still has never addressed in their briefs or argument today. The evidence they wanted to put in were letters from third parties without any corroborating testimony from a witness who could sponsor it and overcome the hearsay objection. The only proffered, non-hearsay reason for that evidence was the fact that it could constitute notice to Epic before the party's license agreement informed Epic's state of mind. That was the distinction the court drew. It was completely proper, completely in keeping with the hearsay nature of the evidence. In addition, the court excluded the evidence on post-L.A. complaints on the additional basis under the Rule 403 factors, finding that the need for a trial within a trial regarding each of these alleged post-license application complaints would unduly protract the trial, be unduly prejudicial and confusing. Silicon Knights has never addressed that issue in their briefs or here today, and that's an independent and adequate grounds for the exclusion of this evidence. And so there was nothing improper about the trial court's rulings on that issue. In addition, the second allegedly excluded evidence talked here today concerned what counsel refers to as a blacklist, but there was no blacklist at all, nor was there any exclusion or proffer made on that. The issue concerned license agreements that Epic entered into with other parties after Silicon Knights had sued. Those agreements did not contain a blacklist, do not work with Silicon Knights. It quite properly included a provision that told other licensees do not share Epic's code with Silicon Knights. Now, is that perfectly proper to do so? I think so in the circumstances where we had learned that Silicon Knights had been massively ripping off our code for years, that we asked our instructor other licensees not to give code to a thief, but be that as it may, the agreements are irrelevant to the claims that were presented. There is no contention that those contracts that said don't share our code are relevant to Silicon Knights' breach of contract claim or to any of our counterclaims, nor are they relevant to Silicon Knights' fraud claims. Those agreements do not tend to show one way or the other to Silicon Knights to induce the license agreement, and if so, whether any such representations were false, were made with the intent to deceive, or were reasonably relied upon. What Silicon Knights is trying to do now on appeal is recast its unfair deceptive trades practice claim to try to make these agreements after the fact relevant to that claim. But the complaint, the unfair deceptive trades practice claim in a complaint focused on the alleged representations made before the license agreement that induced the license agreement. The complaint makes no reference to these do not share clauses in third-party contracts, and furthermore, Silicon Knights has not preserved this issue below. It never sought to introduce into evidence these contracts. All that ever happened below and during trial is that Silicon Knights asked one witness whether he was aware of such an agreement. There was an objection. It was sustained, and Silicon Knights never proffered what the answer of the witness would have been, whether the witness even had knowledge of these agreements, and thereafter Silicon Knights never even moved to introduce the exhibits. So there was no error made with exclusion of these exhibits because they were never introduced. Turning to the counterclaims then, first on the copyright, there is the repeated argument made today that somehow Silicon Knights either didn't prove that the code was copyrighted or didn't prove what was deposited with the copyright office. First of all, let me make clear if it's not already from our breeze. Epic proved that all the Unreal Engine 3 code that Silicon Knights copied was registered. Here are the facts from the record. Silicon Knights first got access to the UE3 code in August 2004. That's when the nine-month evaluation period started. Silicon Knights witnesses testified that they had stopped downloading and merging Epic's code into the Silicon Knights engine by August of 2006. That testimony came from, for example, Silicon Knights director of technology, Mr. O'Reilly, whose testimony on that topic appears on pages 904 and 908 of the joint appendix. So all the code, UE3 code that Silicon Knights copied, came from that two-year period from August 2004 to August 2006. And even though Silicon Knights continued to reclude Epic code in the engine after that period, it all dates from that two-year period. Epic introduced into evidence registrations that covered the UE3 code from August 2004 all the way to October of 2006. They appear in the appendix on pages 2065 through 76. The initial registration from August 2004 on its face covered the entire UE3 code as it existed as of August 2004. And the subsequent registrations that were introduced into evidence without objection applied to the original code plus all quote revisions and updates to the code. So Epic did show in the record, and the evidence was undisputed, that all the code that Silicon Knights says it downloaded and copied were, in fact, subject to registrations. And those registrations were in proper form. As cited in our brief, under regulations in Title 37 of the Code of Federal Regulations, a party is not required to deposit the entirety of the code as part of its registration, just the first 25 and last 25 pages. And the undisputed testimony from Mr. Wilbur at trial, appearing on pages 1001 to 1006 of the joint appendix, is that, in fact, our registrations included the first 25 and last 25 pages. There was no objection to the introduction of the registrations on any other basis. And I could go on and point out as well, Your Honors, that this issue is moot about need to prove registration because Silicon Knights never asked for an instruction saying that Epic had to prove registration. Its instructions on the elements of copyright infringement, instruction 49, appearing at page 74 of the joint appendix, stated that Epic only had to prove two things for a verdict in its favor, that Epic is the owner of a valid copyright and that Silicon Knights copied original elements. There was no mention made of registration as a requirement. And, indeed, the trial court then gave the instructions as Silicon Knights requested, citing only those two elements. Silicon Knights proposed two additional instructions that addressed registration, but those instructions stated only that an owner may but not must register a copyright. And those proposed instructions appear at pages 578 to 579. Silicon Knights' proposed instructions said the consequences of not registering were only that the recovery would be limited to actual damages and profits, but you couldn't recover statutory damages. The trial court adopted Silicon Knights' proposed language, instructed that registration may be done, but never said registration must be done. So it is law of the case that Silicon Knights own request that registration is not an element of Epic's copyright claim. So both as a matter of fact and now as a law of the case, they have identified no basis for setting aside the verdict against them on the copyright claim. Regarding the de minimis issue, I want to make sure the record is clear on this as well, because Silicon Knights keeps arguing that only 2% of Epic's code was copied. That is flat out wrong. Epic's copying, Silicon Knights' copying of Epic's code was intentional. It was systematic. They copied starting off the entirety of our engine and did it not once, but hundreds, if not thousands of times on an almost daily basis as their employees worked on unauthorized video games over a four-year period. Their argument proceeds from an incorrect factual premise. They argue as if the only evidence of copying came from Dr. Felton's comparative analysis. What they say said was 2%, and I'll address that in a moment, explain why that's wrong. The evidence of Silicon Knights' unauthorized copying came from multiple sources in addition to Dr. Felton, sources that proved substantial copying. There were direct admissions by Silicon Knights that they had copied substantial portions of the engine. It started in 2005, as their witness Mr. Barnes explained, when they copied 100% of the engine to start work on their first unauthorized game called The Box. It continued in time when we got to August of 2006 when they said they had stopped downloading additional code. Evidence was presented of PowerPoints and memorandum from the company's president at the time indicating that they would still be using up to 50% of Epic's code in their engine. And even continuing forward in time in the following year, there was a memorandum from their director of technology, Mr. O'Reilly, saying that even at that point in 2008, they were using 21.5% of our code in their engine. There was, in addition to their direct admissions, eyewitness testimony from an independent third party who had inspected the engine in 2008 and found that it included modified and unmodified UE3 code including, quote, lot of the core stuff, end quote. That was Mr. Penwarden's testimony. Silicon Knights focused on the tail end of its use in the summer of 2009 after Silicon Changes to it to foil Dr. Felton's comparative analysis. Well, Silicon Knights doesn't get a pass because in 2009 the amount of code it used or was able to disguise had been decreased, or even if they had stopped using our code altogether. They are and remain liable for their substantial infringement from the time period at least by 2005 continuing into 2009. And even when Dr. Felton identified in his analysis constituted tens of thousands of lines of code that he explained were both qualitatively important to the operation of an engine, what gave it a lot of value, why it was copied, as well as took lots of time and money and creativity to create. And at the end of the day, then whether Silicon Knights copying was substantial or de minimis, and there could hardly be any doubt that it was substantial, is a fact question. There was more than sufficient basis to go to the jury on that question. Silicon Knights was able to make all these arguments to the jury. They did make those arguments to the jury. The jury rejected it. Regarding the trade secrets counterclaim, Your Honor, the evidence is undisputed here on appeal that Silicon Knights misappropriated hundreds of ethics trade secrets. That is, misappropriation was intentional, approved at the highest levels of the company. It lasted several years, and they used them to make tens of millions of dollars. And then when they were called out, that they engaged in what the trial court called a cover-up of a cover-up to try to mask that they had tried to conceal their massive theft. None of these issues are challenged on appeal, but Silicon Knights nonetheless wants a pass for its massive theft. It claims that Epic didn't protect its trade secrets, but Epic did and showed it at trial. Epic uses extensive protections to protect its trade secrets, including state-of-the-art electronic protections, state-of-the-art physical security protections, and of course, legal restrictions that bind its employees and licensees and others with access to its trade secrets. Importantly, there was no evidence presented by Silicon Knights or anyone else that software developers commonly use other protections that Epic does not. And also very importantly, Epic measures have worked. They have worked at maintaining the secrecy of their trade secrets. Two witnesses, very knowledgeable with the computer industry, Mr. Tim Sweeney and Wolfgang Engel, testified that Epic's trade secrets, the ones that issued that were stolen, are not commonly known in the industry, proving that Epic's trade secrets have in fact, protections, have in fact been successful in maintaining the secrecy. Silicon Knights says that all those protections, however, and their proven track record of success mean nothing because Epic didn't audit other licensees to see if they had stolen trade secrets just like Silicon Knights did. Well, that does not entitle Silicon Knights to judgment as a matter of law on our counterclaim and putting aside the jury's considered verdict. The Trade Secret Act requires, if only, that efforts be maintained their secrecy. The Act does not mandate licensee audits. In fact, the Act doesn't mention licensee audits at all. No case has ever held that licensee audits are required. Silicon Knights has certainly never cited any in the six years we've been litigating this case. And indeed, in many other cases, courts have upheld the sufficiency of a software developer's trade secret protections without even mentioning whether or not licensee audits are occurred. And certainly that is the case here because there is no evidence that other licensees had in fact misappropriated Epic's trade secrets. And there was no evidence that other software companies that license software do sort of random spot audits. Certainly a rational jury could and did conclude in these circumstances that Epic took reasonable precautions to protect their trade secrets. The law does not require Epic to harass innocent licensees. Silicon Knights was instead free to argue to the jury our protections weren't reasonable. It did in fact make all those arguments to the jury. And again, the jury rejected them. Finally, Your Honor, on the double recovery issue, there is no double recovery. And so again, I want to make sure the record is clear on this as well. The award on our breach of contract claim was for the unpaid license fees for the five or so games that Silicon Knights worked on without paying a license fee. That award was different than the award on the copyright and trade secrets counterclaims. The award on the copyright and trade secret counterclaims disgorged Silicon Knights' unlawful profits. That's what we got under those claims. The breach of contract damages were separate. So all the counterclaims survived. Silicon Knights is not entitled to judgment as a matter of law to set aside the verdict of any of those. And unless there's any other questions, I thank the court for its attention and ask for affirmance. Mr. Holland, you have some rebuttal time. Yes, Your Honor. Let me just quickly take a few of Mr. Schabowski's points in order. First of all, he led off with the idea that all the evidence was heard. I just think it's manifestly clear, but that's part of my point. All the evidence was not heard. In addition, with respect to the trade secrets, I'd like to raise a couple of points. Mr. Schabowski makes much of the 333 trade secrets. What he ignores is the fact that nearly 1,200 trade secrets were asserted. And at a minimum, when evaluating the attorney's fees award, one should not be able to come in and overstate its alleged claim. To that effect, nearly 80 percent of the alleged trade secrets were asserted, were withdrawn, and then come in and say, I'm entitled to get all my money back for having to this case on that trade secret ground. Secondly, it's not that he goes and sort of creates issues where there are none. There's no case that says a licensee has to be audited. Well, all the case law says that you have to take reasonable steps when you're put on notice that this is potentially occurring. And doing nothing cannot be alleged to be reasonable. I disagree strongly with my colleague's assertion that testimony came in about all these steps that were taken. The only step that was ever discussed at trial was the contract itself, and that's it. In terms of the hearsay issue, I again disagree. I think we've abundantly had that in the record for quite some time. A few times he made the statement that this is not challenged on appeal, this was waived, et cetera. As we cited, particularly with respect to the blacklist issue, on page 22 and 23 of our reply brief, we cited the court to respond to their waiver argument exactly to where the court had both severely, not just, it wasn't just that the blacklist was attempted to be introduced and was objected, it was attempted twice. And on the second attempt, the court made it clear that we were to, in the court's words, move on from that. I then repeatedly throughout the remainder of the trial asked and was assured that all such objections to jury instructions, those types of objections that were made to evidence jury instructions were in fact preserved, and that's again at pages 22 and 23 of the reply brief. So the idea that we waived that and didn't preserve it to be able to talk about here is not correct. In terms of the undue prejudice and undue confusion issue that was attributed to the third party complaint, I believe very clearly or very honestly, Your Honor, that the opposite is true. What was unduly confusing was for the jury to be able to sit there and think that as he just attempted to say that Silicon Heights is some sort of thief, that it stole all this stuff, rather than the opposite of what is true when one looks at those third party complaints. Silicon Heights was in the same position everybody else in the industry was. It couldn't make the code work. And the reason why the de minimis infringement argument exists still today is because as pled in the complaint, before the case even started, the code was being removed. And it continued to be removed because it didn't work. Not for any other reason. Not because there was some surreptitious use being put to it. Not because some benefit was being gained to it. Because it did not work. And that's why Disney, Midway, EA, and all those other people complained about it. And that's why Silicon Heights took it out of the engine. The idea that they're now penalized for having what is called the core component, that's another misnomer. As the testimony at trial made clear, and as we've put in the briefs, that is actually a shorthand version for what's called the math core. The mathematical algorithms that any game engine must be based upon are what the core is. And so while Mr. Schabowski very adeptly says it's the core of the engine, it's only called that because it's something that no engine can be made without and no one can actually own because they're so ubiquitous. And the testimony came in about that. Therefore, the fact that it's supposed to be the core does not show some sort of monetary attribution to it. With respect to the copyright, very briefly, the point is that, yes, you can, you may submit your what you've registered. If you get in litigation, you want to sue someone for copyright infringement. You can't simply say, I registered something, never demonstrate what it is, and then have a jury verdict in the millions of dollars that's based on that. And then further say, I'm going to rely on my statutory registration, which I didn't even prove existed, to bootstrap up an attorney's fees claim on top of that. And really, that's the main point of the case here, Your Honor. The whole theme that he has, even today, as we're sitting here, that Silicon Heights somehow stole everything and wanted to act nefariously in this instance, has one major logical flaw. If that's what they wanted to do, they never would have brought this case. They could have set up in Canada and simply taken the code, and I wouldn't be standing here before you. They came down here to have a right, to have an injustice righted, and this court has the last chance to have that happen. I hope the court will do the right thing. Thank you, Your Honor.
judges: G. Steven Agee, Barbara Milano Keenan, Henry F. Floyd